Good morning. It's a privilege to have the opportunity to speak with you about Appellant's case. We raised a number of issues in our brief and recognizing that my time with you is somewhat limited. Oh, on that note, I did ask to reserve five minutes for rebuttal. Because my time is limited, my intention this morning was to focus my comments on what I see as the most important issue in the case, which is the argument that there was a prejudicial variance from the indictment here. The count one of the indictment, which was incorporated by reference in counts two and three, alleged a conspiracy to commit wire fraud. It was real specific as to how that fraud was committed. It alleged that the appellant and others over about a six or seven week period in the late summer, early fall of 2015 in the Western Pumps. Counsel, I don't mean to interrupt, but I want to get the scope of review. You agree that this is plain error? I don't, Your Honor. What do you do then with the language where, I think it's in page ID 1759, where they said, I wanted to raise this issue, but I don't think it applies? Your Honor, I... You know what I'm referring to? Sure, absolutely. And I've obviously read that portion of the transcript. That kind of suggests that plain error should apply here, right? I mean, the judge is told, here's an argument, but I'm not making it. Well... And the judge can relax, right? I would have to say and agree with you that it is a less than perfect preservation of the issue. Okay, that's a nice way of saying you didn't raise it. Well, first of all, I was not trial counsel. Not that that matters as far as preservation. No, of course not. Even if you were. I mean, people forego arguments all the time. It's perfectly reasonable. In my view, Your Honor, the way reading this in its entirety, the transcript portion, when the parties were going over the jury instructions, trial counsel said to the trial judge, I've considered the issue of multiple conspiracies. I'm not sure if it applies. I've done a little bit of research on it. These are the three conspiracies, different conspiracies that I see that are proven. And I don't think it applies. If I'm wrong, I'm open to correction. The district court then had the ability to express its view on why it thought the instructions would not have any plausibility and that it would be confusing. Later said no objection to the jury instructions. Yes, Your Honor, that's correct. And then the government was able to weigh in on its view of whether the multiple conspiracy instruction would be useful. So, in my view, Your Honor, if the point of raising issues in the trial court is to have the parties express their view and then have the court offer its own input on the issue, I think that I can say that it was raised and preserved. For us to put an imprimatur on that, it just sort of lets the trial, lets the lawyer before a court should be able to take positions so that the court knows what it has to address, not say here's an argument. Don't blame me for making this dumb, hypothetically. Don't want to make it, but I'm not making it. And I certainly understand where you're coming from, Your Honor. I think it's like you're trying to transform the obligation to discuss the issue from the party to the district court. I mean, it's like if we attribute some significance to the district courts having discussed multiple conspiracies when your client's lawyer said I don't think it applies and then said no objection to the instructions, what we're doing is rewarding the district judge for having some, for taking care and discussing it briefly. Well, to the extent that the district judge was able to address its view on it and those views may have swayed trial counsel from pursuing it further. I think as trial lawyers, we're always kind of walking this fine line of beating our fist a little bit too much. Most trial lawyers know how to say I understand, Your Honor, and I preserve my objections. Certainly, and this trial judge is extraordinarily patient and You don't get mad at that, do they, when they just say I preserve my, I don't know, I haven't No, and particularly not this judge, but also Well, as a district judge, you quickly learn that a good bit of what goes on in a criminal trial is only for the sake of preserving the objection. That's often what it's all about. So should we apply the plain error doctrine then in analyzing this? Well, I would ask for de novo review as we have, but even on plain error review, I think that we have a legitimate issue regarding the multiple conspiracies. Last week, I was a little bit of a Johnny-come-lately also submitting some supplemental authorities of court on the United States v. Mize. It was a great road map for this particular case and why I did not find it when I was originally briefing the case, I don't know, shame on me, but as I was preparing for oral argument, it did come up. That's fine, and I wouldn't suggest that you don't show us stuff that you find along the way. The issue in the other case had to do with how much was being charged for that. Totally understood, but my, it was a case that was out there and I should have found it in the initial process, but I did eventually find it and I think it's real helpful. So if we get to the, I mean, we've been talking about the standard of review, but if we get to the underlying issue, why is there any error at all in calling this not a material variance? Well because I believe, as I've laid out in the brief, that there were actually four different conspiracies about which there was evidence in this case. The indictment charged a conspiracy to use skimming devices in this real specific time Specifically, there was wide-ranging evidence that involved testimony, documentary evidence, forensic evidence about different, multiple conspiracies. So is the problem the time frame of the other so-called conspiracies? The time frame, the membership, the means, there was extensive evidence about the fraudulent use of credit card numbers that were purchased from the internet. Why couldn't all of that be one giant conspiracy? Well, I suppose it could have been, but it wasn't charged that way and when we're talking about... Wait a minute. Excuse me. Wasn't a single conspiracy charged? And defined with specific time parameters and by specific... Well, we all know that you can go a bit outside those time parameters and most indictments, I can't recall about this one, say on or about and it's understood that that can encompass a somewhat broader time frame. And I certainly agree with you there, but we're talking about a whole year of evidence versus probably a six or seven week period that's charged in the indictment. We're talking about... Well, you know, even if you considered the credit card use not per se a part of the conspiracy, it would have been relevant evidence because it would have shown how they ultimately got involved in the skimmers due to the lack of success with the first scheme. Well, and that may be, but I think that when you're trying to offer it that way, it's either comes in as res gesti or 404B. And certainly if it comes in as 404B, there are limiting instructions that are placed on it as to how the jury can use it. And if it comes in... Well, you've got some problems there too, because without a lawyer to raise those kinds of objections, and you don't even make that particular argument here. That's just my observation. I mean, you've got a problem there. Right. Well, but I think were it to be remanded, these things could be parsed out more finely. You know, res gesti isn't totally far flung as well. What we really need to do is focus on what's the least prejudicial way to give things context when we're talking about res gesti. So rather than offering a lot of testimony or forensic evidence or cell tower evidence about other separate conspiracies to give context to the one that this one evolved into, you can do it in a much less prejudicial way. You talk about the indictment as being critical with the dates, but looking at count one, it says beginning not later than July 24th, 2015, and continuing until at least September 9th, 2015. So it is giving leeway at the edges, time-wise. Sure, and just as a factual matter, there's nothing after September 9th I'm complaining about. That's when the evidence pretty much ended as far as the conspiratorial activities. But leading up to it, I'm not sure, frankly, what the authority would be on this, but I wouldn't think that beginning not later than July 24th wouldn't necessarily include things that are going on in March or February or April. So the events were all in 2015? All the events about which there was evidence were in 2015, yes, Your Honor. Thank you. Any other questions? Thank you. We'll give you your rebuttal time. Good morning and may it please the Court, Assistant U.S. Attorney Hagan Frank for the United States. I tried this case in the district court, and I submit that the record in front of this court establishes that this defendant received a scrupulously fair trial. I telegraphed all my punches, or the punches I intended to throw, presented an amount of evidence that went unrebutted, and that explains why the jury came back in short order with guilty findings on all counts. Now on this variance issue, I would respectfully, Judge Moore and Judge Rogers, you asked whether plain error should apply. I submit that this issue was affirmatively waived. We look at that transcript, Judge Rogers, that you focused on, from 1759 to 1760, the page ID numbers. The defense counsel didn't say that she had just read a few cases. She said, I read quite a lot of case law, quote, I'm not intending to offer any sort of argument that there were multiple conspiracies. Then she went on, I wanted to raise the issue so that everybody knows I looked at it. I don't think it applies. It's hard for me to imagine a more explicit and knowing waiver of an issue by a defense counsel on the record than that. I think this issue was waived, and then the district court's . . . Why did the district court go on to talk about it? Because I think the district court was leaving the door open, that if she wanted to revisit it, she could. I think you can think about it and see if anything gels over the weekend, is what the district court said. Then express the opinion that that would be a tough row to hoe, and then that any instruction along those lines, based on the evidence that had come in at that point, because this is after proofs, the district court opined that that would be a confusing instruction, and defense counsel said, that was my conclusion. This issue was waived in the government's opinion, and I think that should end the discussion of this issue. However, if we do move on to plain error, which is defendant's burden to prove then, what we have is proof of a single overarching conspiracy with the same cadre of people who made different trips and different configurations over time, all of them at the direction of this defendant. This was a . . . the proofs established a collective venture with a common goal, and the only thing that changed over time was one aspect of the scheme. The scheme was to get other people's credit information and cash in on it. That's the scheme, and you do that by getting that information and re-encoding cards. The only thing that changed as the conspiracy ran its course with the same group of people operating all over the United States at defendant's direction, the only thing that changed was the means of acquiring the account data, where they started out buying it online, and a lot in the mid-July timeframe of 2015, defendant figured out a better mousetrap. But the scheme was always about catching mice. It was always the same group of people out there trying to catch mice. I want to ask a question based on what you said, but not on the issue you were talking about. When you say a lot of those numbers were duds, is that the word, or didn't work? Yes, Your Honor. Duds as in dud grenades, they . . . Yeah, okay. So were the duds counted later at $500 each? Oh, at sentencing? Yeah. Yes, Your Honor. And properly so, because although that's not brief, but the precedent in this court on that issue is that a means of identification doesn't have to be one that you actually cash in. It could be a . . . Could it be one that you tried to cash in and it didn't work? Yes. Yes, Your Honor. Why didn't they work? Because they'd already been presumably . . . In this sort of case, when you get these numbers online, you're dealing with someone who hacked into a database somewhere and then auctioned it off and may have auctioned the same number off to more than one person. So it's already been exploited and that number has been shut down. Well, would these be numbers that were stolen in the first place that folks who owned, say, a card and became aware their information had been stolen would presumably report that and get a new card? Is that right? Exactly. Once they find out that it's been stolen. They might not know if it's a result of a hack. Exactly. Well, you don't know . . . A victim in a hack scenario doesn't know that their information has been compromised until someone tries to exploit it. And then the bank sniffer systems flag that transaction and shut down the card. And our case agent . . . my case agent testified this at the beginning of his testimony about the difference between . . . we'll call them recoding schemes. If you get the numbers online, you're going to have a very large, for lack of a better term, dud rate. You're going to have a lot of numbers that you can't exploit. And that's the advantage of skimming them from gas pumps because those are freshly harvested. They're local. So if you encode those on another access device and go shopping with them . . . I think I understand that. I have another question about the MOI. What is the necessity for these trips? I understand why drug dealers have to make trips all the time, but why are they . . . what is the necessary aspect to this crime that you're always making these trips? Can't you go to your local target and do the same thing? You can, but then if you create a hotspot and law enforcement gets . . . Create a what? A hotspot, an area where this activity is known to be going on and has been going on long enough for law enforcement to get its antenna up and start focusing its investigative resources on that area, you increase the odds of getting caught if you're the person doing this. So, for instance . . . Is that what they're thinking when they drive all over the country to do this? Yes, Your Honor. And then sometimes, like in the upper Midwest, we have these Meijer stores. I've had other cases, because I do a lot of these carting cases, where they're attracted to a particular retailer and the policies that the retailer has in selling prepaid debit cards. And if you can use a self-checkout line and swipe as many re-encoded cards as necessary to buy new store value cards, then you're going to gravitate towards those stores. So, for instance, the upper Midwest, Ohio, Michigan, where we have all these Meijer stores, that draws people from as far as Florida, from as far as Texas. But it's also . . . motion is life in this sort of case. The more you move, the lower your odds of getting caught. And if you get caught . . . That answers my question. I appreciate it. It wasn't really relevant, but I appreciate it anyway. All right. Your Honor, thank you. So, my understanding, though, was that the argument on the other side is that there were several different groups, so that there were arguably multiple conspiracies as opposed to one single conspiracy. And why isn't that the case here, that Perez-Martinez would be the head of this group and the head of that group and the head of another group? Because the evidence on different groups broke down into two groups. One, there was this fellow named Alexi Roman that some of the co-defendants testified to that they went and they were doing this type of fraud for him in Colorado shortly after they got to Texas from Cuba. That didn't work out, so they joined this defendant's group. This defendant's group consisted of a cadre of about six people, Falcon, Gregori, Carballa, Sanchez, Pupo, and a guy named Mafu. That group consistently, not always the same five or six of them, but consistently over time, constellations of those different groups, a core group of people, traveled around, all of them working for Antonio Perez. It's like a drug conspiracy where everybody doesn't make all the trips, but that doesn't mean that there isn't one single conspiracy. Exactly, Your Honor, exactly. Who was Mafu? Was that not Perez-Martinez or was that somebody else? Both. There is an actual Yuan Mafu, and he is a guy who was involved in this conspiracy. He was a roommate of Falcon's. So there is a fellow named Yuan Mafu who did make fraud trips. The reason I said both is because when the defendant was calling this defense attorney that he hired for Falcon and Pupo after they got arrested in Michigan in August, the defense lawyer testified that he was retained by a guy who gave his name as Yuan Mafu. And that Yuan Mafu called him a lot, I mean a lot. And then we had connection records showing that the number that was calling in to that defense attorney was a cell number ending in 2028. That 2028 number, we superglued that to the defendant through several different means, including calls that he had made to an insurance adjuster to try and get his car repaired in the summer of 2015. So anyway, we identified that 2028 number as solidly this defendant's number. That number called the defense attorney who was hired to represent Falcon and Pupo. And the caller said his name was Mafu. But then the connection records between that defense attorney and 2028, the number that was calling all the time, showed that it was 2028, which was Perez-Martinez's number. And then we also picked up Perez-Martinez on a jail call with Falcon and Pupo when they said, yeah, our lawyer is keeping Mafu informed. And then Perez-Martinez says, yeah, I'm Mafu, that's me. So that's why I said that Mafu comes up in two contexts. So in any event, the elements, our proof did not change the elements of any of these offenses. We have overlapping personnel. We have a common goal. And the only thing that changed was the means of acquiring the numbers. And that's just building a better mousetrap. But it doesn't change this from a conspiracy by this defendant and a known cadre of people to be involved in a mouse-catching conspiracy. I have a few minutes left if the Court has no more questions on the variance issue. The only other issue that a defendant stuck with in his reply brief was the issue of the notion that the District Court made a mistake by admitting evidence of flight. We submit that the standard review for that issue, while normally admission of evidence is reviewed for abuse of discretion, we think that in this case at most it's plain error because, again, the defense at trial, it's hard not to see how they didn't waive any objection to the instruction on flight. Six times, six times in the record, the issue of flight came up. It came up in the draft instructions before the final pretrial conference where the defense counsel noted that their objection to that was that they were going to argue that the defendant left Texas not because he was running away from this case but because he was going to Canada to visit family. And I don't recall any evidence being presented that he'd gone to Canada to visit family, but in any event, that was the defense's first pushback on flight saying, well, we don't think that he was running from the case. We think he was going to Canada to visit family. Second time it came up was in the final pretrial conference where the district court brought up that draft instruction that had been submitted by the parties and said, asked, and this is at 2013 in the record, asked if this was just an argument, going to be an argument based on the facts, whether he went to Canada to visit family or whether he was running from our case or whether there was a legal issue there. And then the district court asked that if the jury hears testimony and believes your client left the jurisdiction for the reasons the government articulates, I guess it would fall within the flight instruction, right? And the defense said, yes, it probably would. And they went on to say, and if that's how the evidence comes in, it makes sense to me to have an instruction about that if the facts are proved that he did leave at the same time. Well, the facts did prove that he left at the same time because his probation officer, who was supervising him on this previous Texas conviction before committing carding fraud, testified that she last saw him in September of 2015, that he missed his October appointment, that when she called the cell phone number, his brother answered that phone number, that they made affirmative efforts to find him in Williamson County in Texas in November and couldn't find him. And that's all at 1668 to 1669 in the record. And then, of course, we know that he stayed gone until he got caught crossing from Canada into Derby Line, Vermont in September of 2017. So the government did present evidence. Oh, and the other important thing I almost missed, forgot to mention, is that if we look at that phone call pattern between the 2028 number of defendant and the defense lawyer in Michigan that he had hired to represent Falcon and Pupo, and this is at 2034, it was a summary chart presented by the government, there were 136 contacts between 25 August and 9 September of 2015. 136 contacts with 34 voice calls and 102 text messages. And that was right about the time, early September, when the defense lawyer told, quote-unquote, Mafu, that this case was going federal. No more calls after 9 September. September is also the last time that Texas probation officer saw a defendant. He didn't show up in October and they couldn't find him in November. And again, he stayed gone in Canada until he got caught in September of 2017. So the defense conceded that flight was going to be appropriate at trial if the proofs were there indicating that he left at the time this was going federal. The proofs were there that he left at the time this was going federal. And there's no other discussion between the district judge and the defense lawyer about the flight instruction? There is actually, Your Honor. The day before trial, there was a hearing on an unrelated issue. Let me back up a second. At the final pretrial conference, the district court had said, plan on it coming in. And then the day before trial, the district court said that it was incorporating its comments from the final pretrial conference on ruling on the 404B motion and the Texas matter in general. Then when I had the Texas probation officer on direct and we went into heading towards the flight instruction, there was no defense objection. Then after that testimony, the district court gave a preliminary flight instruction to the jury. The defense did not object. Then in the final instruction conference at 1834, the defense did not object. And what was the actual flight instruction? It was the court's Sixth Circuit, this court's standard instruction. Pattern instruction. Yes, Your Honor. It was a standard instruction. There's no variation. I won't use the word variance. No variation from the Sixth Circuit pattern. Right. There's nothing fancy about it. It was a straight leg flight instruction. And I'm out of time. Thank you. Thank you very much. If I may, Your Honors, I'll just be brief. I guess I would, again, ask the court to take a look at United States v. Mize. It has a nice roadmap for even plain error review on the variance issue. In that case, there were three defendants, and all three had their convictions reversed and a new trial ordered. And one of the defendants hadn't raised the variance issue at trial or even on appeal, and the court still reversed. But that, doubtless, was because of the parallelism among the three, right? The panel didn't really discuss it in great detail. The dissent criticized the panel for doing that. I would assume that would be the reason. It would be hard to reverse on two and not on the third on that type of issue. You would know better than I would. I would assume that's why. But it does find plain error nevertheless. I think that there truly were multiple conspiracies here. In this Alexi Roman character that is brought up, there's a conspiracy at the end to which Mr. Perez-Martinez had no connection, and Mize lays it out pretty well about how this idea of building a better mousetrap sometimes really is a separate conspiracy. Regarding the 404B evidence, there was an objection to the flight instruction, and that's not what we raised. What we raised was the admission of the evidence at all. It was something that the existence of a prior conviction for credit card fraud was noticed by the government prior to trial as being a potential area of 404B evidence. It was the subject of a motion in limine by defense counsel to preclude it. It was addressed at the final pretrial conference, and when the court, if it has the time, can read the transcript from the final pretrial conference, the government had not yet formally advanced the theory that the prior conviction was going to be used for anything other than intent. It had not yet advanced the theory that it was going to be using that prior conviction as evidence of a flight from probation. So when Judge Yonker said plan on it coming in, that wasn't a ruling or even an advisory ruling. It was a be prepared and we'll deal with it after the government submits something in writing outlining its permissible purposes and those types of things. It was sort of a better to have it and not need it than need it and not have it type ruling from the bench. Be ready for it, and then we'll discuss it in more detail. And it was discussed in more detail. The pretrial ruling, as I read the record, was that the fact of the conviction could come in, but the other information about whether or not he left the country and absconded on probation, that that wasn't fair game. That all sort of changed in the middle of trial due to the persistence of the government, but that is what the objection was, and I do believe that it is preserved. And if you don't have anything else, I appreciate it. Thank you both for your argument. The case will be submitted.